Larry, can you please call the first case? Case number 13-3376, consolidated with 13-3486, the estate of Lorraine P. Phillips. All right, would the counselors please step up and identify yourselves, please? Good morning, your honors. For the record, Frank Andreou, A-N-D-R-E-O-U, on behalf of the estate of Lorraine Phillips. Tim Eaton, on behalf of Great American Insurance Company and the other insurance plaintiffs. Okay. Good morning, Steven Collins on behalf of the city of Chicago. Mark Wolfe, on behalf of Hennigan Reckon, as well as Chicago. Okay, all right, bottle parties are at 15 minutes, and then time for rebuttal, yes? Yes. Okay. Your honor, we would like to divide our time, 10 and 5. 10 and 5? Divide for me, Tim. Okay, all right. And we would like to split our time evenly. Okay, all right. Thank you. Okay, proceed. May it please the court, my name is Tim Eaton, and I represent the Great American Insurance Company and the other plaintiffs that are listed as the insurance company plaintiffs, and we are the appellant. The trial court should have permitted the jury to be instructed on our strict liability counts, both statutory and common law, and I will address each in turn. But first, I want to address an issue which was raised by the city front and center in their brief, and that is the general verdict rule. It simply does not apply. The general verdict rule says that where there is more than one theory and there is a general verdict, the verdict will be upheld if there is sufficient evidence to sustain either theory and the defendant having failed to request special interrogatories cannot complain. What is important to note, your honors, is we did not appeal the verdict. My plaintiffs did not appeal the verdict. We appealed the judgment. We appealed the ruling on the summary judgment on the common law strict liability. We appealed the motion in Normandy that was granted by the trial judge with respect to the statutory liability. So therefore, what's our standard of review then? It's de novo. Okay. And so with respect to this issue of the general verdict, that somehow we should have tendered special interrogatories to a jury that did not even hear a case on strict liability, that was not instructed on strict liability, there was no evidence presented on strict liability because we were prohibited from doing so, is quite frankly just nonsense. So that is not an issue. With respect to the common law strict liability, to me, the overarching question that's facing this court is whether the unavoidable risk of harm that is inherent in the Normandebolition requires that it be carried out at the peril of the person performing it, in this case, Hennigan, rather than at the expense of innocent parties who suffered as a result of it, in this case, the buildings adjacent to the property. We submit that the demolition company should bear this responsibility because it chose, we did not, as a matter of business judgment to perform the demolition, and they are in the best position to provide liability insurance protecting against any resultant collateral damage, which we clearly had here. I know the court is aware of the six factors with respect to strict liability under common law. I will not go through the restatement, but I will highlight a few points. The courts have uniformly held that you do not need to have all six factors before strict liability is applied. In this case, Judge Griffin, in finding in the summary judgment on strict liability, he found the first four factors are not contested. The first four factors of those six weigh in our favor in terms of strict liability. The one that he was most concerned about in not applying it was the locality factor. And the issue there was the city and Hennigan were saying, well, it couldn't have been done anywhere else. It had to be done there. So what they're really proposing is a bright-line test that you don't weigh the factors, even though four here clearly weigh in our favor, if the locality is not something that they chose. We would argue, and I think the law should be, that that's a neutral factor where the locality could not have been chosen. Not a dispositive factor that should weigh against us. And I love the fact that maybe it's inapplicable. Yes, it's inapplicable. It doesn't apply where you don't choose. I agree, Your Honor. I think that's the better way, actually, to phrase it. And then we get to the public policy. I understand the concern about the L in the emergency situation, the demolition. But again, the case law does not provide for an exception where there's an emergency, for an exception where work has to be done right away. What the case law says is you look at the public policy in general, and then you weigh all six factors. And I submit that the public policy that is at stake here was set by the Chicago City Council, because this does involve an urban demolition, where it requires contractors engaged in the demolition to obtain comprehensive public liability and property damage policies which shall keep and save harmless any owner of property adjacent to the property in which the building or structure to be wrecked is located. That's the public policy as well of the city of Chicago. And of the municipal ordinance for the state of Illinois, which we argue under 1.4-7, is also a strict liability, a statutory strict liability against the city where they execute a demolition through an agent. Now, the trial court held that that didn't apply because it has wording in there that refers to actionable wrong. But he said that had to be negligence. That makes no sense, because if you read further in the provision, it says that the work has to be done with due care. And that's the only time it can apply. So how can you have negligence when the statute itself requires due care? It's purely a strict liability provision that the jury should have been instructed on. And we have no doubt in our mind, had there been strict liability either in common law or statutory, that there would have been a different result, that there wouldn't have been a verdict in our favor. The other thing that I would mention with respect to common law liability, on strict liability, is that for this court to hold that this urban demolition was not abnormally dangerous, would in effect have to overrule the first district's decision in Clark versus City of Chicago, which was cited by the Supreme Court in the Chicago court of litigation. And Clark holds that the demolition of a five-story building within the City of Chicago constitutes an inherently dangerous activity as a matter of law, and therefore the city should be absolutely liable. I might add, counsel for the other side has suggested that somehow Clark is no longer good law. If you look at IPI Instruction 115-01, which we cite in our brief, it deals with the subject of what constitutes ultra-hazardous activity for purposes of strict liability, and it cites the Clark case. That's current, 2015, the Supreme Court has approved that instruction. Clark has not been overruled, and this court would have to overrule it to find against us, and the trial court simply ignored it. In short, your honors, we would request that this case be remanded back for a new trial so that the jury can be instructed on strict liability, both common law and statutory, which we point out in our brief. Thank you very much. Thank you. Good morning, may it please the court. Morning. As identified earlier, I'm Frank Andreo, and I represent the estate of Lorraine Phillips, a disabled person. And we, in large part, have adopted the insurance plaintiff's argument on strict liability, so I won't belabor the point. The only thing I would want to add is if this court is so inclined to find an emergency exception to the strict liability standard, the only question I would ask the court to ponder is how long does that emergency exception last? And it turns back to the facts of this case. Now, we brought a claim for the 632 building adjacent to the building that was on fire. At the city of Chicago, when they went before the court to seek an emergency order of demolition, they said at best there would be minimal damage to the 632 building, and that this wall to the south was not in imminent danger of collapse. The primary concern that the record company had to address was protecting those L tracks, and they had done that. The job was done, they also had ceased the risk of the north wall falling onto the insurance plaintiff's building, and they went home. Over the next course of a few days, the demolition continued, debris rained down on the 632 building, and they too had to be demolished. We did have a claim against the city for wrongful demolition, which settled. So the question is, how long does the emergency exception last, if it in fact exists, which we don't concede? We're just assuming for the sake of argument today that it might. And if it does, there was no emergency, because by the time they got to our demolition, that wall that was the threat to the CTA tracks had been abated. And that's really kind of focusing on the weight that Judge Griffin had placed on the six factor, the public policy factor. And in the record, at C10226 and at A0020, in his opinion he basically, Judge Griffin basically stated that if we apply strict liability to anybody who comes in, in an emergency situation for demolition, then no one will want to do it. Well, Hennigan has paid over $950,000 to do this demolition. They carried insurance, they were hedged against risk, and they even sought indemnification from the city. There were people who were pre-approved for these jobs, nobody can just walk in and bid. So I think everybody understands the risk when they come into this type of a situation. And more to the insurance plaintiff's point, this is a task that Hennigan voluntarily undertook. They weren't compelled to do so. Now they couldn't refuse to bid the job, I understand, because they were one of the ten that were approved to do so. But they did in fact bid, they represented that they can do it, and through one of the city's agents stated that the 632 building would not suffer significant damage. But it did, and ultimately it had to be demolished. We had asked for the strict liability instruction, and we would also argue that we should have gotten it, and we would ask for a new trial based on that. Briefly on the other end of it, one of the things I wanted to address with the court today is the verdict itself. Ms. Phillips is a disabled person who, as a result of not sitting for a deposition, some might argue due to her disability, she was barred from presenting any evidence at the trial by way of her own testimony. So it is our assertion that the record is not clear and doesn't have sufficient facts to show what steps she took to ensure that she did not negligently hire an independent contractor, which was what a friendly was. All that the estate did was, and I'm not trying to minimize what the estate did, but they caused a condition to occur. And that condition was that the building did not have sufficient fire suppression systems and was in violation of the code. However, Ms. Phillips did not start the fire, she did not operate the torch, she did not supervise the work. So the question becomes whether or not the work done by the independent contractor at Friendly can be imputed back upon her. He is an independent contractor who was not engaged in an inherently dangerous activity, as working with a torch in the Woodward case we cite was not an inherently dangerous activity. And in that case, the facts were very similar to this one. Not only was the independent contractor not qualified to work with the acetylene torch, he was also drunk when he was doing it. And he caused a fire in a similar building that didn't have fire suppression systems, and the fire jumped to the neighboring buildings. In that case, the court refused to impart negligence on behalf of the owners, because there was an intervening cause, and that was the negligence of the independent contractor. So when we turn to whether or not Ms. Phillips had negligently hired at Friendly, we know from the record that Mr. Lee was introduced by a third party, Mr. Galani, who had stated that Mr. Lee had done this kind of work before. Mr. Lee was informed that there was no fire suppression system, he said he could handle it anyway. Was it reasonable for Ms. Phillips, by that time an elderly individual, to rely on Mr. Lee, and we assert that she was reasonable, and that's the standard. Was what she had done reasonable? Now, we don't know what she was thinking, because the record is silent. When the jury entered its verdict finding that the estate was either entirely liable for its damage to 632, or more than 50%, which was verdict form J. They didn't have enough information or evidence to show that that was the case. All they knew was the end result. There was a building, and this is what Hennigan's counsel argued, but we didn't start the fire, the estate did. The estate did not start the fire, the estate created a condition and a third party intervened. And another third party intervened, which ended up resulting in damage to 632, and that was the demolition. Wrecking balls were not indicated to be used on the demolition of the 620 building, the 630 building, and it was, and that caused damage to our building, 632, which ultimately needed to be demolished completely. So we're asking the court to overturn the verdict. Thank you. Thank you. Thank you. Counsel, before you proceed, can you identify which issues you're going to be addressing? Yes, your honor. May it please the court, on behalf of the city, I would like to make three points this morning. First, that any error dismissing the strict liability claims was harmless. Second, that strict liability does not apply here, because the demolition did not create the risk of harm. And finally, that the Illinois Municipal Code does not impose strict liability. All right, and can you also address the issue that was raised by counsel this morning with regards to the jury instruction? I'm sorry, and I should clarify, Mr. Wolfe, on behalf of Hennigan and Concord, we'll be addressing the restatement factors, as well as the estate's claim for a new trial. All right, thank you. Thanks. So first, with respect to the harmless error issue. This case went to trial on negligence claims, which presented two key issues for the jury to decide. First, whether the defendants acted negligently. And second, whether they approximately caused the insurer's damages. The jury's general verdict in favor of the defendants gives rise to a presumption that the defendants prevailed on both of those issues, including that they did not approximately cause the damages. Now, if this case went forward on strict liability claims, the plaintiffs would have to prove proximate cause all over again, based on the exact same conduct by the defendants. But the jury already found that that conduct did not approximately cause the damages. And so for that reason, any error dismissing the strict liability claims was harmless. You know, the cases that you cite in your brief are all multiple claims. Not necessarily, Your Honor. There are some cases where there are multiple defenses, such as that the defendant did not act negligently, and that there was contributory negligence. And in that sense, those cases are similar to what we have here, in that the defendant's defenses here were that they did not act negligently, number one. And two, that they were not approximate cause. In this case, the jury was presented only with the claim for negligence. It was only a negligence claim, but it also had to... So how could a general verdict give any bearing on what you're talking about? Because the general verdict gives rise to a presumption that the jury found in favor of the defendants on both of the issues that it had to decide. And one of those issues was proximate cause. And proximate cause is equally required in any strict liability claim. And so the presumption that the defendants did not proximately cause the damages, necessarily defeats any strict liability claim arising out of this demolition. Well, we don't know what was in the subject of manifestation of thought of the jury. We don't know that they found or didn't find proximate cause. I don't know where you get that from. Well, it's true that we don't know subjectively what the jury decided, but this court's cases are clear that if a party wants to preserve an appeal, it has to present a special interrogatory that would have revealed the jury's determination, the basis for its verdict. Is there a case that says that they have to file a special interrogatory? The cases uniformly say that absent a special interrogatory, the appellate court cannot determine the precise basis for the jury's verdict. And so it is presumed that the jury found in favor of the prevailing party on all issues that were presented. I think you ought to just argue the substance of the insurance plaintiff's claims. Well, should this court reach whether this demolition activity gives rise to strict liability, the court should reject that proposition  As the Supreme Court made clear in the Chicago flood case, strict liability is for activities that create an abnormal danger. And in this case, it was the fire that created the risk that the walls would collapse. And indeed, the circuit court in the emergency demolition proceedings found, and this is an undisputed finding in this case,  And the demolition was ordered in order to abate that risk. So in no sense did the demolition create the risk of harm. And since strict liability applies only to activities that create risks of harm, strict liability does not apply here. And so the court can reject the insurer's argument for common law strict liability on that basis alone without resorting to the restatement factors. Now, finally, with respect to the Illinois Municipal Code issue. Well, in regard to strict liability, we're dealing with factors. And I think this case hinges on the last two factors. So if you want to address those factors as to why we take those factors and consider them to be the two most important things to weigh the case in your favor. I'm happy to, Your Honor. I should say Mr. Wolfe is also prepared to address three statement factors. But to address your question, number one, the factor of the appropriateness or inappropriateness of the location where the demolition is taking place. Plainly, the demolition here could not have taken place in any other location besides where it did. So therefore, I mean, how is that even applicable? It's applicable in that it clearly weighs in favor of I mean, what case is there that you could cite that would say that that's applicable? The cases say that this factor is meant to persuade a party that's conducting the activity to move the location to some other place where it's less dangerous. That's the reason for this factor. And where the location of the activity cannot be moved because it's impossible to move it. Well, I don't see how it's applicable. Convince me how it's applicable. Because it's impossible, it would have been impossible to give the defendants any incentive to move the location of the activity to somewhere else. It had to take place at the location of the Wirt-Dexter building. There's no way it could have taken place anywhere else. And so there's no way to give the defendants any incentive to move the activity to some less populated place. Well, I think that that factor is a factor where, you know, when you could do the activity wherever you want to do it, that I don't think it's applicable. You're going to show me how this could be applicable. Well, I agree, Your Honor, that it is applicable where a party can carry on an activity wherever he or she wants. That's why the factor is there. It's that it can't move the building somewhere else and do it. They can only demolish it here. So how is it applicable? It's applicable in that it weighs in favor of the defendants. It's similar to, I believe the restatement gives the example of mining activities. I mean, what case under similar circumstances can you cite that shows that it will be applicable? Your Honor, unfortunately, we don't know of any cases. I mean, I don't care if it's in Illinois or whether it's somewhere else in the world. Show me some case, some citation, some authority. Do you have any? Well, you know, the Chicago flood case. The Chicago flood case doesn't say that. It weighed all the restatement factors, and it found that the factor of the location weighed in favor of no strict liability because the activity could not take place anywhere else. And that's the same as we have here. And similarly, in the comments to the restatement, the comments give the example of mining activity, which is another activity that cannot take place anywhere else other than where the mined materials are. And when that's the case, that factor weighs against strict liability. And so we submit that our case here is similar to that situation. Why don't you proceed? Sure. With respect to the Illinois Municipal Code, the statute does not impose strict liability. Rather, it requires an actionable wrong. And as we've explained, the demolition here is not actionable in strict liability under the common law. And for that reason, the statute does not independently impose strict liability. And indeed, if the legislature wanted to impose strict liability, it could have done that pretty easily, either by saying that a municipality is strictly liable for any harm or, at a minimum, that the municipality is liable for any harm, regardless of whether an actionable wrong took place. And so for that reason, the code does not impose strict liability independently. And for the public policy factors, with respect to the Illinois Municipal Code, the policy factors weigh in favor of no strict liability, because this activity in question here is an emergency demolition that was necessary to protect the public safety. And this is not a profit-making venture for the city. This is a public service that was conducted. And so from a policy standpoint, it would be totally inappropriate to impose strict liability. And for these reasons, the judgment of the circuit court should be affirmed. Thank you. Thank you. Good morning. As I had previously indicated, I am Mark Wolfe, and I represent, along with Katie Callahan, I represent Patrick Hennigan, who is with us today. I am going to comment on two points. One, the argument that somehow the negligent verdict as against the Phillips was somehow improper, inappropriate. And secondly, I will talk a little bit about the restatement. And I promise you, Judge Gordon, I will answer your questions as best I can on the questions that you raised to my co-counsel. I would like to start with what I view as almost a no-brainer with regard to the Phillips. Your Honor, the Phillipses owned the building. They created what can only be described as an extreme condition for all involved. They ignored court orders. The building was, by any definition, in terrible, terrible shape. It had no sprinklers, no stairs, no doors, no water. It had nothing for the fire department to use to put out the fire. On top of that, then, instead of getting a permit, and instead of going to the court as they were required to do by court order, they went ahead and hired an unlicensed individual by the name of Ephraim Lee to essentially perform an activity which caused the fire. In that regard, to suggest that somehow, just because Mr. Lee started the fire, that there was an intervening cause, I think is absolutely disingenuous. They set all of the activity, in this case, in motion. They hired Mr. Lee. He did not have the ability to obtain a permit. Nobody obtained a permit. And even if you look at the trial testimony, Mr. Lee said, in no uncertain terms, that it was the responsibility of the owner, that they were the general contractor. They were to supply fire protection. They were to supply the blankets. They were to supply the water. They were to supply the fire extinguishers, and they were to supply the sprinklers. So to suggest that Ephraim Lee somehow is an intervening cause, I think is inappropriate. I will move on from there. I'd like to talk a little bit now about the case by the insurance plaintiffs and the Phillips with regard to the restatement, the emergent nation of the fire, and the fact that they believe strict liability was important. I think it's important that both Judge Griffin, in his partial summary judgment ruling, and in an entire trial, both went through an exhaustive review of the case law, wrote, in my experience, for trial court judges, very long, detailed decisions, all pointing out the reasons why they thought that strict liability was important. This was an emergent situation is an understatement. The record contains photographs. The videos that were shown to the jury were dramatic. Mr. Hennigan did not start this fire. Mr. Hennigan's company had nothing to do with going to the court and getting this demolition order and any of the subjects that were brought up there. His job was to take this building down, per the order of the court, to the very best of his abilities. If you look at the cases, and specifically let's talk about Clark. Clark, that's a case where they had all the time in the world to plan that demolition and a bystander on the other side of the street somehow gets hurt. That is not the case here. There was no ability to plan. In fact, I think it's telling that the building manager from the insurance plaintiff's own building wouldn't go help Patrick Hennigan to get on the roof and take a look at any precautions that could have been made. It was that dangerous. So he didn't have the ability to plan like some of those other cases that you read about. He didn't have complete control of the site. The fire commander had complete control of the site. There was water, and one comment that was made that somehow by the Phillips that somehow there was no emergency, there was water being put on that fire before, during, and after Mr. Hennigan took down that building. There was fire spots the very moment in time that building fell down and Mr. Hennigan wasn't there. So to suggest that somehow the emergency was over and that somehow we could have taken a break and come up with a new plan is absolutely not borne out by the record in this case. I don't think the case hinges on the last two factors, which you're talking about. I don't think the case hinges on that. Let's go right to your question, Justice Gordon. You asked, is there a case in this state that talks about the fifth factor? I didn't say this state. I don't care where it is. If you don't have one here, you could find one somewhere else. I believe that Chicago flood on page 212 answers that question. It states that some activities can only be carried on in a particular place. If these activities are of sufficient value to the community, they may not be regarded as abnormally dangerous where they are so located, since the only place where the activity can be carried on must necessarily be regarded as the appropriate one. I believe that that is right on point. I'm sorry. And if it is on point, why should it be given the weight that it was given here? Well, let's go back to compare some of the other cases. In Clark, there's all the time in the world a guy somewhere across the street gets hurt. In some of these other cases, they have all the time in the world to plan and do this safe. We didn't have that here. Hennigan did not have that here. They weren't even in control of the site. They were told how to proceed. So I think you have... But why would that weigh into the factors? Because if you look at factor number F, extents to which its value to the community is outweighed by its dangerous attributes, you have one of the biggest fires, according to the fire department, that we've ever seen. You had 200 to 300 firefighters. You had 70,000 people affected by the taking down of the L. I don't know how anything more of value to the community you could have than that. So I think that, especially F, is so critical to this analysis. This was such an emergency. This was such a value to the community that you cannot call this an ultra-hazardous activity. If no one undertook this demolition, the four freestanding walls would have fallen down. Then Wabash would have been closed, then the L would have been closed, and both of their buildings would have been in worse shape than they already were. It had to be taken down. I think that the Chicago flood case just goes over and over and over in detail how to analyze this case. And as opposed to the Clark case, which I don't know why opposing counsel suggests it has to be overturned, or it has to be ignored, or why we have to create exceptions. The Clark case was a real simple case that for whatever reason, we don't know, they didn't analyze the restatements. I don't think it's a big stretch to say that if they had used the six, I think they could have come up with the same conclusion. It's such an apple and an orange to this case that it's just not the same thing. And it doesn't have to be overturned. It can easily, easily, easily be distinguished. Because generally speaking, if a demolition company takes down a five-story building with seven months to take a look at it and can take all the precautions in the world, you've got a different analysis. Mr. Hennigan and our expert in this case said if they had had the time, if they had the ability, they would have taken it down probably by hand from the top. That would have been the way to do it. It would have taken forever, but it would have been safer. They didn't have that here. So I think that absolutely the subsection F in particular, and all the facts in general, lead to the inescapable conclusion that this was simply not an ultra-hazardous activity. Doesn't the Chicago flood case also indicate that you have to look at all the factors, not just one factor? Absolutely. And does it also distinguish Clark in that instance? As I've said, I believe that in many respects, Chicago flood and Clark is an apple and an orange. Chicago flood went through an analysis of all six of the restatement factors. I don't know why Clark didn't. There is no doubt that every factor has to be looked at. But Chicago flood makes it equally apparent to all of us that it's not, oh, they get four and they get two, so four minus two is two, that they win. That's not it either. There is a weighing factor here, and I think it is that weighing factor that took the court to where they went to in Chicago flood and respectfully should take the court to the same decision as Chicago flood here. Unless there's anything further, that's all I have. Thank you. Yes? Justice Golden, let me address your question again. There is no case law in Illinois that holds that the fifth factor can somehow trump the other factors. And in fact, the in-way Chicago flood litigation mentions the fifth factor, and I agree with counsel, page 212 of that opinion, it discusses it after, after the court had found that there was no high degree of risk, that the likelihood of the harm result will not be great, and that the inability to eliminate the risk by the exercise of reasonable care was present. They rejected those three factors, and then they went through a wrong way of looking at five and six, if the city in Hennigan's position prevails, this court would be holding that when you have any demolition, period, whether it be emergency or non-emergency, you cannot have strict liability, because in a demolition, you don't choose a location. If the building is there, and you demolish it, and the question is, who should pay for it? The cloud manager until the end of the landowner is next to it, or the person who is undertaking the responsibility and is being paid a handsome amount to do it? I think the answer is obvious. It should have fallen on Hennigan's shoulders and the city's shoulders, and that factor is not applicable in a demolition, period, whether it be emergent or not. And let me just make one more comment with respect to the general verdict. If I had asked Judge Panter, the trial judge, to give me a special interrogatory on a count that wasn't even before the jury, where there had been no evidence before the jury, he would have looked at me like I had three heads. That special interrogatory here could not have been achieved, and the general verdict, which we didn't appeal, does not apply. Thank you very much. I just brought one comment to follow up on Mr. Wolfe's comments about the emergency, and they didn't take a break. When the damage was done to 632, it took over a week to happen. It didn't happen at the time they were trying to save the L tracks. When the L tracks were saved, and when the Boeing to the north was abated, they went home. They were done. They stopped working and came back the next day. I just want to make that clear. Thank you. All right. The court wants to thank counsels for a well-argued matter. We're going to take it under advisement, and we'll proceed with the next case.